ORIGINAL

FILED
DEC - 7 2006

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE HASKELL COMPANY<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | ) | DOCKET NO.<br><br>06-830 C<br><br>COMPLAINT |

The Plaintiff, The Haskell Company ("Haskell"), complaining of the Defendant, The United States of America, ("United States" or the "Government") would respectfully show unto this court as follows:

## JURISDICTIONAL AND FACTUAL ALLEGATIONS

1. Haskell's claims arise under the Contracts Disputes Act of 1978, 41 U.S.C. §609(a)(1). This Court has jurisdiction over such claims under 28 U.S.C. §1491(a).

2. On or about February 2, 2001, the United States Federal Bureau of Prisons entered into a contract (contract # JX00c-411) with Haskell for the construction of a Federal Prison facility in Yazoo City, Mississippi (hereinafter the "Project").

3. The contract, before modification, originally required Haskell to complete the Project within approximately 940 calendar days. Among other things, the contract also contained specific provisions and clauses allowing the contract time to be adjusted by change order or for events or circumstances, such as inclement weather, beyond the control of the Contractor. The contract also contained a changes provision allowing for an equitable adjustment

in the value of the contract or the time to complete the work, or both, in the event of actual or constructive changes imposed by the Government during the course of construction. The contract also contained a liquidated damages provision which provided that in the event of late completion, the Government would impose an assessment of $10,000.00 (ten thousand dollars) per day.

4. During the course of the Project, the Government and Haskell agreed that if Haskell encountered adverse weather impacts for more than four days in any given month, the contract time would be extended by change order. Following this course of dealing and agreement, the Government from time to time extended the contract time and implemented this agreement by formal modifications to the contract. Haskell relied upon this course of dealing and agreement in planning, coordinating and executing its work.

5. During the course of construction, the Government also executed contract modification number 6 which provided that the Government would pay Haskell an incentive fee for early completion of the work in an amount not less than $10,000.00 (ten thousand dollars) per day in a cumulative amount not to exceed $300,000.00 (three hundred thousand dollars). Modification number 6 purported to exempt the agreement from the provisions of the Disputes clause of the contract, but it did not exempt the agreement, nor would it have been lawful to exempt the agreement from, the provisions of the Contract Disputes Act or the jurisdiction of this court. Moreover, to the extent that the Government would contend that the operation of the Disputes clause is necessary to invoke the jurisdiction of this court, the Disputes clause is necessarily included in the agreement and governs resolutions of disputes concerning the incentive fee by operation of law and pursuant to the doctrine of G.L Christian v. United States.

6. Existing soils conditions and the topography of the Project site made the work, and in particular the site work, particularly susceptible to weather conditions. From September, 2001, through February, 2002 the Yazoo City area experienced unusually severe weather and rainfall well in excess of the ten year average. The Government extended the contract time for this excessive rainfall.

7. One year later, beginning in September, 2002, the inclement weather returned to Yazoo City. From September until February, 2003, there were in excess of ninety nine days of recorded rainfall. Pursuant to the course of dealing and the agreement for time extensions, Haskell requested an extension of time. The Government granted a partial time extension to Haskell but refused to allow Haskell a full and proper time extension. The Government denied Haskell's request for thirty five (35) days and Haskell reserved its rights to seek an equitable adjustment for additional time as a consequence of the inclement weather.

8. Haskell encountered in excess of thirty five (35) days of excusable delay. As a consequence of the Government's refusal to grant Haskell a full and proper time extension, Haskell was confronted with the prospect of liability for liquidated damages for late completion and the Government's decision to effectively accelerate the completion of the work. The contracting officer was aware of the excusable delay, Haskell's request for time extension, and the unreasonable refusal of the request for additional time. The Government thereby constructively accelerated certain portions of the project.

9. As a consequence of the foregoing, Haskell accelerated certain portions of the project and undertook additional work and less efficient work in an effort to meet the constructively accelerated schedule. This additional work included, but was not limited to, additional fine grading, additional maintenance of temporary roads, additional clean-up,

additional site work and soil stabilization, overtime, and work which was less efficient than anticipated. Haskell, because of the acceleration, altered its methods and means of construction and was forced to perform the work in a less efficient and out of sequence manner than it had originally intended. These changes, including the use of significant overtime, led to losses of labor productivity. Overall, these conditions caused Haskell and its subcontractors to incur additional expenses attributable to the acceleration in excess of one million six hundred fifty six thousand eight hundred twenty eight ($1,656,828.00) dollars for which the government is liable.

10. As a consequence of the forced acceleration Haskell completed the work in full accordance with the contract and modification six which should have resulted in an award of the full incentive fee of $300,000.00 to Haskell. The Government has arbitrarily and capriciously denied the incentive fee award and/or denied the award to Haskell in retaliation for Haskell's refusal to execute a full release to the Government and the Government is liable to Haskell for the full incentive fee.

11. On or about December 7, 2005, Haskell submitted a documented and properly certified claim to the Contracting Officer pursuant to the contract and the Contract Disputes Act of 1978. A copy of the certified claim (excluding supporting documents and attachments) is attached hereto at exhibit A and incorporated herein by reference.

12. On or about February 3, 2006, the Contracting Officer issued a final decision and denied the claim in its entirety.

**FOR A FIRST CLAIM**
**(Claim for Equitable Adjustment Pursuant to the Changes Clause)**

13. The allegations contained in the paragraphs above, not inconsistent herewith, are incorporated herein, as if repeated verbatim.

12. Haskell is entitled to an equitable adjustment under the contract's changes clause because the United States improperly:

(a) failed to extend the contract time;

(b) actively and constructively accelerated Haskell's work;

(c) deviated from the agreement to provide time extensions in accordance with the course of dealing between the parties;

(d) failed to award the full incentive fee to Haskell;

(e) imposed more difficult conditions in the manner in which Haskell was able to complete its work;

(f) improperly dictated the means and methods of Haskell's performance;

(g) disrupted Haskell's performance

(h) failed to administer the project in good faith.

27. As a consequence of the foregoing conduct, Haskell has been damaged and has incurred substantial additional costs in completing the Project, administering the Project and other costs, which are reasonably, and directly allocable to the contract and for which the United States is liable. Haskell is further entitled to interest on the remaining contract balance pursuant to the Prompt Payment Act and interest on the claim pursuant to the Contract Disputes Act and the Government is therefore liable to Haskell in an amount in excess of one million eight hundred thousand ($1,800,000.00) dollars.

## PLAINTIFF'S DEMANDS

WHEREFORE, by reason of the foregoing, Plaintiff demands judgment as follows:

1. $1,656,828 as requested in Haskell's Certified Claim, plus;

2. interest, delay damages, lost efficiencies, consequential damages, additional damages to be proven at the trial of this case, plus;

3. interest under §12 of the Contracts Disputes Act, 41 U.S.C. §611 from the date the C.O. received the Plaintiff's Certified Claim dated December 7, 2005, until payment thereof, plus;

4. costs allowed under Rule 54(d) of the rules of this Court, plus;

5. any other relief this Court deems just and proper.

Henry P. Wall
E. Wade Mullins, III
BRUNER, POWELL, ROBBINS, WALL
& MULLINS, LLC
1735 St. Julian Place, Suite 200
P.O. Box 61110
Columbia, South Carolina 29260-1110
(803)252-7693

ATTORNEYS FOR PLAINTIFF

Columbia, South Carolina

December 4, 2006

# EXHIBIT A

# CERTIFIED CLAIM
# OF
# THE HASKELL COMPANY

# FEDERAL BUREAU OF PRISONS
# CONTRACT NO. JX00C-411

# FOR THE

# FEDERAL CORRECTIONAL INSTITUTION
# YAZOO CITY, MISSISSIPPI

# DECEMBER 7, 2005

# TABLE OF CONTENTS


| | |
|---|---|
| SECTION ONE | **Introduction** |
| SECTION TWO | **Summary of Claim** |
| SECTION THREE | **THC Design-Build Experience/Relationship with FBOP**<br>A. THC's General History and its Experience with Design-Build<br>B. THC's History with FBOP |
| SECTION FOUR | **Factual Background**<br>A. THC's Proposal for Yazoo City<br>B. Sitework Plan<br>C. Impact of Site Conditions |
| SECTION FIVE | **Cost Impact**<br>A. Damages Methodologies<br>B. Individual Claim Items<br>C. Early Completion Bonus<br>D. Summary of Damage Claim |
| SECTION SIX | **Certification of Claim** |
| SECTION SEVEN | **Attachments A-F** |
| SECTION EIGHT | **Exhibits 1-13** |

# I. INTRODUCTION

The Haskell Company ("THC"), pursuant to the Contracts Disputes Act, 41 U.S.C. § 601, et seq. hereby submits this Certified Claim ("Claim") in connection with THC's performance of Federal Bureau of Prisons Contract No. JX00c-411 for the Federal Correctional Institution in Yazoo City, Mississippi. THC is requesting a Contractor's Officer's final decision on the Claim. Pursuant to 41 U.S.C. §605(c)(2), you are required to, within sixty days, either issue a Contractor's Officer's Final Decision or notify THC when a decision will be issued.

The Claim is presented in sections. Section II, immediately following, provides a summary of the facts relevant to THC's Claim. Section III provides an overview of our Design/Build experience and relationship with the FBOP. Section IV sets forth a detailed factual background of the Claim. Section V sets forth the cost impact associated with the Claim. Sections VI and VII contain exhibits and attachments and Section VIII contains the certification required under the Contracts Disputes Act.

THC is willing to meet with you in an attempt to resolve this Claim. In that regard, please advise if you wish to do so.

## II. SUMMARY OF CLAIM

During the course of performing the Yazoo City contract, THC encountered numerous situations that dramatically increased THC's cost. Nonetheless, THC completed the Project ahead of schedule and under FBOP's budget. However, THC suffered a significant loss on the Project, with such loss exceeding $14 million dollars.

THC recognizes that, under the terms of its contract, it assumed various economic risks and is responsible for a large portion of the overall loss on the Project. However, under the terms of the contract, particularly as those terms have been interpreted by judicial authorities, the FBOP shares responsibility for a portion of THC's loss. In this Claim, THC seeks a total upward revision in its contract price of $1,956,828. This claim includes $1,656,828 for acceleration/loss of productivity damages incurred from September 2002 through February 2003 and also $300,000 based on FBOP's failure to pay THC the early completion bonus due under the contract.

THC attempted to resolve this matter at the project level but was unable to do so. THC was, and remains committed to the partnering process as evident in the significant investments THC made to help ensure the success of this Project and to further its relationship with the FBOP. Examples of THC's investments in the success of this Project include the following:

- THC incurred significant added costs in efforts to comply with the government's minority business participation requirements, in particular during the critical performance period for the underground utilities.

- THC increased its project management staffing levels well above planned levels for a design/build project of this nature in an attempt to minimize delays and maximize our responsiveness to the FBOP. In response to management concerns about severe weather, two corporate vice presidents and another general superintendent were assigned to the onsite project staff during the third quarter of 2002.

- We have provided added value throughout the project, without compensation, by furnishing enhanced finishes and improved construction materials.

- We continued to perform work, throughout the duration of the project, virtually every weekend to reduce schedule impacts brought about by severe weather. Ultimately, THC invested approximately 68,500 hours of overtime.

THC has never been a "claims oriented" contractor, and does not intend to become one. It is simply not our way of doing business. However, in this case, the magnitude of the loss is such that THC cannot simply walk away from this Claim.

It is important to note that THC is not looking to blame the FBOP for what happened, nor is it seeking to "get well" economically. Rather, THC is requesting payment for the additional costs incurred during the September 2002 to February 2003 time period and FBOP's failure to pay the early completion bonus. Given the uncertainty as to how many days FBOP would ultimately grant and the reality that THC faced possible liquidated damages ("LDs") of $10,000 per day, THC had no option but to accelerate its work during this time period to avoid LDs. This acceleration resulted in additional costs, including loss of productivity, that are the subject of this Claim. Moreover, FBOP ultimately denied THC's request for 35 of the days requested during the September 2002 to February 2003 time period, thus forcing THC to constructively accelerate its work to complete the Project and avoid the imposition of LDs.

For most of the first year of the project, THC's work effort proceeded according to plan. However beginning in October 2001 and continuing into December 2001 through February 2002, the Yazoo City area experienced 47 days of unusually of severe rain (Attachment A) of which THC only requested 40 days, with the FBOP agreeing only to 26 days. For the last three months in 2001, rainfall amounts exceeded the previous 10-year average by as much as 30%. Attachment B includes selected photos illustrating the site problems encountered. This increase in rainfall had a dramatic effect on the site

conditions, which in turn, greatly impacted THC's performance. Despite performing the earthwork construction and sitework in accordance with the guidelines in the geotechnical report, THC was unable to maintain a workable site. The combination of heavy clay fill material in both the underlying site and the only available fill, the large flat site and the excessive rainfall virtually rendered the site unworkable, and considerably impacted THC's work in all areas of the project. Even after the rains subsided, their effects lingered for months. Then, just as THC had begun to restore productivity to the pre-rain period, the project experienced unusually severe wet weather from September 2002 through February 2003 (Attachment C). During this period of time, rainfall amounts exceeded the previous 10-year average by as much as 380%. Once again, the site became very nearly an unworkable quagmire, and THC had to take extraordinary measures to continue progressing the work. Attachment D includes selected photos illustrating the types of site problems encountered.

The effects of the site problems were felt throughout the project. Virtually no area of work was unaffected. As the information set forth in tab Section V, demonstrates, THC's productivity and efficiency suffered markedly during and well after the rainy periods.

Severe weather impacted THC for 147 days during construction or over 15% of the original contract duration. The FBOP granted 96 days additional time for severe weather without monetary consideration but refused 35 of the days requested for the September 2002 – February 2003 time period.

As noted previously, THC approaches this process reluctantly, but it does so seriously because of the significant impact it has suffered on this project. The following sections elaborate on the points made here, and form the basis of this Claim.

## III. THC DESIGN-BUILD EXPERIENCE/ RELATIONSHIP WITH FBOP

### A. THC's General History and its Experience with Design-Build

THC was founded in Jacksonville, Florida in 1965. During its 38-year history, the company has emerged as an innovative and leading force in design-build, construction, construction management and design of commercial, institutional and industrial buildings. The Company began business as a design-build firm, and has remained an industry leader in that delivery system since its inception. THC has completed more than 850 design-build projects. Our trademark, "America's Design-Build Leader" is testament to our expertise and respect we have earned in the business.

In its first decade the company completed over 100 projects, with operations growing into nearly all of the southeastern states. The range of building types broadened to include manufacturing plants, distribution facilities, office buildings and shopping centers. During these years, repeat customers became a large part of our business.

During the 1970's, the company became a fully integrated design-build organization and its client base expanded to include numerous national corporations. In the 1980's several market initiatives enlarged the scope of the company's operations. Healthcare and continuing care projects were pursued, forming the basis of THC Community Developers, which has emerged as a leader in the continuing care field. A major thrust took the company into refrigerated facilities for food processors, grocery chains, and cold storage warehouses

In the late 1980's the company entered the public sector market, concentrating on schools, jails, prisons, and courthouses as well as projects for the Florida Department of Transportation and the Florida Department of Management Services. Criminal Justice projects were pursued with good success, and represented a respectable percentage of the Company's business.

THC has constructed many large and very complicated projects with a variety of site conditions. The Alltel Stadium, built ten

years ago, was a partnership with HOK Sport with a contract of $130 million – at the time it was the largest project the Company had undertaken. Falkenburg Road Jail in Tampa is an example of a $65 million design-build project with many of the same building considerations found at Yazoo City. Built in phases for Hillsborough County, this project was designed and built completely by our own in-house staff.

**B. THC's Relationship with the FBOP**

Beginning in 1997, the company's commitment to and success in the criminal justice market led it to begin actively pursuing FBOP work. Given THC's experience in criminal justice work, and the FBOP's shift to the design-build approach made the FBOP a compelling prospect to develop a long-term relationship with.

THC participated in four unsuccessful proposal efforts from 1997 through 2000, prior to being awarded the Yazoo City project. In the first two of these solicitations, THC was not shortlisted – whereas in the second two it was shortlisted. Each of these proposal efforts for an FBOP design-build project requires a significant effort. Over the course of these solicitations we learned a great deal about the FBOP and its process, and the FBOP learned more about THC and its capabilities.

THC has enjoyed very good working relations with the FBOP. On numerous occasions, we have been congratulated on the quality of our product, and the tenacity and constructive attitude of our project team. An incentive program was instituted for this and several other FBOP projects in 2001, offering $1,000,000 for the design-builder going 'above and beyond' established standards. THC was awarded incentive bonus money on this Project mainly because of the quality of our work.

## IV. Factual Background

### A. THC's Proposal for Yazoo City

The Phase I proposal for the Yazoo City project was submitted by THC to the FBOP in December 1999. The Phase I proposal was a qualification submission, identifying THC's team and outlining its qualifications to perform the work. Key project team members and partners selected by THC were carefully chosen to ensure success. THC's project team was well qualified, with extensive experience in similar types of work, capable of meeting the challenge. All key partners, such as HKS (our design partner), were experienced, well respected firms with proven track records.

Following the Phase I proposal, THC was shortlisted with four other firms. After being shortlisted, the technical and price proposal was to be submitted within 45 days, with best and final proposals approximately 30 days later. The Phase II Technical and Price proposal was submitted in October 2000, followed by a Best and Final Submission in November 2000.

The project was awarded to THC in January 2001. We were selected based upon the government's 'best value' criteria, based on the combination of our proposed design, schedule, quality, and cost. This whole process took almost one year from initial submission to award.

### B. Sitework Plan

THC's design and plan were based on the requirements set forth in the FBOP solicitation documents. With regard to the civil/site work portion of the work, the FBOP solicitation included topographical survey information, sitework criteria specifications, and a Geotechnical report issued by Louis-Berger (who subcontracted the actual work to Burns Cooley Dennis) as well as any information gathered from local subcontractors. During the FBOP sponsored preproposal conference/site visit by the shortlisted firms, the FBOP responded to a question regarding whether bidders would be permitted to make a site visit "to examine the site conditions and determine how to construct infrastructure and earthwork problems" the FBOP responded *no further site visits would be allowed* (Attachment E).

The pre-proposal conference/site visit consisted of a briefing at the existing facility, followed by a short site tour. This allowed only a cursory review of the site conditions. The site consisted mainly of unimproved farmland. Nothing was noted as extraordinary during the short site tour.

The geotechnical report included in the FBOP solicitation provided "recommendations related to the design and construction of the project." It included "guideline recommendations for site preparation and earthwork construction" as well as "foundation design and construction, below grade walls, and guideline pavement design." With respect to the site preparation and earthwork construction, the recommendations in the geotechnical report included the following:

- Provide a minimum 5-ft (1.5 m) zone of buffer soils below floor slabs and below finished grade adjacent to buildings, and a minimum zone of 3-ft (0.9 m) below pavements.
- Soils exposed after stripping should be scarified (to minimum depth of 6 in.) and compacted (to at least 95% of standard Proctor maximum dry density) or proofrolled to demonstrate stability in areas within 10' of the limits of buildings. Other areas (i.e., not within building areas) should be stabilized if not sufficiently strong to compact initial lifts of fill with stability.
- It was noted that the construction techniques and types of equipment utilized and site drainage provided during construction would have a great effect on performance of the near-surface silty soils throughout the project.
- Select fill materials should extend for a minimum of 10 ft beyond the buildings. Select fills should consist of silty-clays (CL) or sandy clays (CL) having a liquid limit < 45 and a plasticity index in range of 10-25, or slightly clayey silty sands (SM) having a plasticity index in range of 3-15 and a liquid limit < 35. Locally available loessial silts (ML) can also be utilized – but are very sensitive to variations in moisture and close moisture control will be important. Use of sands (SC, SM) or silts (MLs) was not recommended in direct contact with underlying expansive clays (CH).

- Compaction requirements and moisture/density testing were provided for fill (including one set of requirements for structural fill and another set of requirements for non-structural fill).
- Additional recommendations for fill material utilized for pavement subgrade construction were also provided.

In accordance with these recommendations, THC planned to use locally available fill materials, and to limit the use of the available CLs to the areas noted in the geotechnical report as requiring "select fill" – i.e., the areas under the building pads, roads and pavements. Pricing was obtained and analyzed against our internal quantity survey and estimating efforts. Contact was made with local vendors for pricing and input regarding availability of local fill. All site subcontractors received plans, specifications, and the geotech report supplied by the FBOP. Drawings were complete enough for subcontractors to perform a detailed quantity take-offs.

The specifications, drawings, and geotech report were relied upon for an understanding of the existing site conditions and the sitework requirements. Given the 'completeness' of the bid package, the sitework requirements appeared to be straightforward. No unusual qualifications, exclusions or exceptions were noted from any of the vendors or project team.

THC takes pride in the fact that we have worked all over the United States and in particular, the southeast. Our breadth of experience includes 41 projects in Alabama, Arkansas and Mississippi (Attachment F). We have an excellent working knowledge and experience with varying soil conditions.

As required by the Division 1 specifications of the Technical Design Guidelines, a three-day Value Engineering workshop was held for the project on February 27 through March 1, 2001. Gaddam and Associates, Engineers facilitated the workshop (who had done previous work for the FBOP and was on the list of approved facilitators provided to THC by the Bureau). The attendees consisted of all design team members, senior project manager, superintendent, estimators, and project managers from Consolidated Electric, Integrated Systems, Ivey Mechanical, and United Piping.

Value Engineering (VE) alternatives were generated in work groups by discipline in the following five areas:

- Civil/site
- Architectural
- Structural
- Mechanical
- Electrical

Each discipline group generated between 10 and 40 VE ideas. Each suggestion had a savings estimate (a conceptual 'decision making' number) generated and the FBOP generally indicated whether they would consider or reject the suggestion.

A VE suggestion of lowering the site by one foot (suggestion C-1) was generated during that meeting with an estimated savings of $200,000. The FBOP analyzed and agreed to the suggestion and on April 6, 2001, the Contracting Officer wrote a letter indicating which of the VE ideas would be accepted. The FBOP agreed with adjusting the site elevation, directing a Contractor Proposed Change (CPC) to be prepared to finalize all savings. The VE option of lowering the site was accepted in that letter. Per the FAR requirements, the savings from VE suggestions incorporated into the project are shared equally between the FBOP and THC.

It should be noted that by lowering the site, less fill material would be required, thus generating the savings from both labor and material. If the site remained at its original elevation, *more* CL and CH material would have been needed to complete site grading. This likely would have exacerbated the site problems discussed in this REA.

The overall construction schedule was broken down into three phases (or "packages"), consistent with the FBOP solicitation and THC's proposal. These phases were:

- Early Sitework Package – The early sitework package included the work necessary to bring the site to grade. This included clearing and grubbing, site underground electrical, and building pads and access roads. This required approximately 2.2 meters of fill in the FBOP's original

design. The design elevation was subsequently lowered approximately 0.5 meters under a value engineering change initiated by THC.

The early sitework package also included temporary storm drainage measures, including trenches/pumping, retention ponds and temporary grading (to maintain positive drainage). Temporary drainage piping was installed at road crossings and at the construction access road to facilitate site drainage during rainy weather.

- Package 'A' – Package A included the housing units (i.e., Special Housing and General Housing A, B, and C), and the UNICOR Factory. These housing buildings were included in Package A because they required more time to complete than the simpler, less complex facilities included in Package B. The UNICOR Factory was included because it could be finished quickly and used as a warehouse facility for the balance of the project. Package A also included installation of the site sanitary and storm drainage systems.

- Package 'B' – Package B included all remaining buildings and other areas not included in the two previous design packages (e.g., CFC buildings, Waste Water Building, CUP, Sally Port area).

**C. Impact of Site Conditions**

For most of the first year of the project, THC's work effort proceeded according to plan. However, from September 2001 through February 2002, the Yazoo City area experienced unusually severe rain (Attachment A). These 40 days of severe weather, well above the previous 10-year history, had a dramatic effect on the site conditions. In turn, THC's performance was greatly impacted. Despite performing the earthwork construction and sitework as referenced in the geotechnical report, THC was unable to maintain a workable site. The combination of heavy clay fill material in both the underlying site and the available fill, the limited use of less expansive fills, the large flat site and the excessive rainfall basically rendered the site unworkable, and considerably impacted THC's work in all areas of the project. Even after

the rains subsided, their effects lingered for months. This was due to the repeated days of unfavorable drying conditions (e.g. overcast skies, limited air currents, cool temperatures and humidity), preventing the shallow supersaturated clayey soils and the deeply soaked low plasticity soils to dry out. A day of severe weather routinely created unsuitable soil conditions for a week after the initial occurrence. Nevertheless, THC's productivity improved significantly in the spring and summer of 2002 until the project experienced another bout of unusually severe wet weather, beginning in September 2002. During this period, the project encountered over 99 days of rainfall, exceeding previous 10 year average rainfalls by as much as 380% (Attachment C). Once again, the site became largely unworkable, and THC had to take extraordinary measures to attain any degree of productivity.

FBOP has recognized that THC has encountered an extraordinary amount of adverse weather by granting a number of weather-related time extensions. Early in the project FBOP and THC had agreed that, based on the ten-year weather history for the local area, THC should anticipate four days of adverse weather per month (where adverse weather was defined as ¼" or more of rain during a 24-hour period). It was thus agreed that if the project were impacted by rain for more than four days in a month, then THC would issue a Contractor Proposed Change (CPC) requesting a weather related time extension. Pursuant to this agreement, the FBOP has granted a total of 96 days of 147 requested for extraordinary adverse weather. Thus, FBOP denied 51 requested days, 35 of which were in the September 2002 – February 2003 time frame that is the subject of this Claim.

THC is seeking compensation for the lost productivity and other impacts that occurred during the September 2002 to February 2003 time period.

**September 2002 to February 2003**

As unusually wet weather returned in September 2002 through February 2003, the site conditions again deteriorated, impacting productivity. The total value of work completed per

month declined from $5.3 million/month to $3.8 million/month, a reduction of over 25% due to our inability to perform the work during this period of severe weather. Rain was especially heavy in September and October 2002 due to two hurricanes that occurred within one week of each other, depositing more rain in the area than had been ever recorded. October was determined to be the 8th wettest October on record since the first accounts were recorded in the late 1800's. During October alone, rainfall exceeded the previous 10-year average by over 380% (Attachment C). THC requested a total of 99 calendar days of additional time for excessive weather during this period, and received only 64 days from the FBOP.

The site conditions had the most impact on remaining sitework activities, such as completion of all remaining backfilling, concrete paving, placement of asphalt, final grading of site, and security fencing. Other activities impacted by the site conditions included remaining concrete work on the buildings and daily clean-up activities.

Work arounds during this time period included many of the previously mentioned as well as:

- Utilizing significant lime stabilization methods to enable the security fence subcontractor's critical activities to continue. THC also lime stabilized the fence berm around the entire perimeter of the prison.

- Removing and replacing supersaturated subgrade materials, previously installed for exterior concrete paving work.

- Renting dozers and other heavy equipment for maintenance of the site. Our own forces operated this equipment.

- Mandating overtime work for operators to operate the heavy equipment, and laborers to assist in the dewatering and demucking (removing contaminated or saturated soils) process.

- Continuing the lime stabilization of numerous areas of construction throughout the site to provide a "drying" agent for the saturated soils.

- Hiring additional personnel and dedicating these fulltime crews to handle just the mud and water entering the buildings from foot and equipment traffic.

- Expanding the use of temporary wood plank roads to enable access to buildings PS, MS and FS for setting of precast panels and steel erection. The use of planking allowed immediate access to these areas, provided a safe platform for crane operations, and would require no further maintenance.

- Placing of hundreds of tons of limestone where needed to allow access and to stabilize the ground.

### 1. <u>Summary</u>

THC took measures to ensure that the work would continue, despite the refusal to grant the time extension it was entitled to, due to the possible imposition of LDs. Protecting the schedule and getting the job done was the ultimate goal. Our chief concern was to complete the project safely, timely, and with a high degree of quality. However, the refusal to grant the additional time resulted in a loss of productivity and additional costs. Despite extraordinary soil stabilization, site maintenance and water control efforts, the wet weather and site conditions caused much of the foundation work to either to be placed inefficiently or stopped altogether. Many times work had to be redone before other work could continue. Work was disrupted and performed out of sequence. Again, THC had no option but to proceed forward given the significant LDs that THC would face if the Project was not completed on time.

The impact to THC is not in dispute. During unimpacted dry periods THC was able to complete work at a rate that was equal to or better than the scheduled rate, and at a quality level praised by the FBOP. Thus, THC's lost of productivity is supported by the contemporaneous Project records.

## V. Cost Impact

As stated above, during the period September 2002 through February 2003, THC requested 99 days and received 64 days - thus 35 requested days of time extension were rejected by FBOP. As a result, THC was forced to continue to devote considerable expense to achieve a completion date that should have been extended. Given the significant LDs, THC had no option but do so.

As set forth on Table 1 below (as well as Exhibit 1), THC's acceleration/ loss of productivity claim is composed of nine separate claim items. The total amount sought by THC for these items is $1,656,828. Exhibits 1 through 10 include spreadsheets that set forth the calculation of each of these claim items, by individual element and type of cost.

**Table 1**

**Summary of THC's Acceleration Damages on the Yazoo City Project**

| Claim Item | Claim Amount |
|---|---|
| Added Fine Grading Under Slabs | $ 14,725 |
| Lost Labor Productivity on Concrete Formwork | $ 150,302 |
| Added Concrete Placement Costs | $ 29,495 |
| Lost Labor Productivity on Concrete Finishing | $ 121,974 |
| Added Maintenance of Temporary Roads | $ 352,080 |
| Added Clean-up Activities | $ 302,285 |
| Rework Subgrade | $ 262,966 |
| Soil Stabilization Costs | $ 301,688 |
| Subtotal of REA Items | $1,535,515 |
| Additional Overhead/Profit/Commission | $ 121,314 |
| **Total Acceleration Claim Amount** | **$1,656,828** |

## A. Damages Methodologies

THC's claimed damages are based upon actual costs incurred, as recorded on the project books and records through June 30, 2003. As is typical for a claim with several different elements, THC has employed various methodologies for quantifying its increased costs, as appropriate for each type of increased cost. Listed below are the primary types of damages claimed, and the methodologies used to quantify each type.

### 1. Discrete Impacts

For added work that is entirely incremental and compensable, THC has identified the costs directly from detailed project cost data, including timecards, invoices, purchase orders, and cost reports. In many instances, other project documentation, such as daily reports, diaries, etc., were used to assist in identifying time periods and locations in which the added work was occurring. For some discrete impacts, THC set up separate subcontracts and/or cost codes for the performance of that work. Such items are based upon actual costs recorded for such subcontracts.

### 2. Claimed Amounts for Lost Productivity

Where the costs of impacted work was commingled in the project cost records with the costs of original contract work, THC performed detailed analyses to quantify only the increased costs above the level that would have been expended under normal conditions in the absence of the acceleration. For these items, involving inefficiency or lost productivity due to the acceleration, THC's damages have been calculated based upon a "measured mile" methodology, described in more detail below.

THC incurred significantly increased labor and equipment costs due to lost productivity resulting from its acceleration efforts. The inefficiency costs addressed here primarily relate to additional costs that THC incurred to perform the specified contract work in order to achieve contract completion earlier than was appropriate had the FBOP granted THC additional time (i.e., a manner very different than planned).

As stated above, THC has quantified each of its lost productivity claims using the measured mile methodology. The

measured mile methodology determines the costs that would have been expended to perform the impacted work in the absence of the compensable impacts, and quantifies the increased costs above that level. This method is generally considered to be the most accepted and most reliable method available for isolating and quantifying increased costs incurred due to lost productivity.

Correct application of the measured mile method begins with a study of any less impacted performance on the project. The productivity achieved on this less impacted work serves as the "measured mile" of productivity, representing the estimate of the productivity that would have been achieved on the entire project if not for the impacts encountered. For this project, the unimpacted periods identified are the periods July 2001 through November 2001 and then March 2002 through August 2002.

Once it is determined that the type and scope of work in the measured mile period or area is comparable to the impacted work, the impacted quantities installed are multiplied by the unimpacted productivity rate achieved on the measured mile work, to determine what the impacted work would have cost if performed in an unimpacted manner. This "should cost" is compared to the actual cost of the impacted work, with the difference being the added costs due to the lost productivity.

THC's lost productivity determinations are calculated using recorded labor costs and quantity data (e.g., cubic yards of earth moved; square footage of formwork erected, etc.) from the project accounting system. In addition to the costs of lost labor productivity, THC's claim includes increased costs related to reduced productivity on concrete equipment.

**3. <u>Indirect Costs and Markup Rates</u>**

THC's damages include an allocable amount of indirect costs, including general conditions costs, overhead expenses, and others. As is generally accepted in the construction industry, these costs have been calculated using a percentage markup on direct costs. Each element of indirect cost, and the basis for the proposed rate, is described below.

a. **General Conditions**

General Conditions are a component of costs on all construction projects. General conditions are composed of the resources required to manage and support the direct construction activities, and generally includes salaries for project management, engineering and support personnel; jobsite office supplies; office trailers, furniture and equipment; temporary toilets; temporary electric and water service; janitorial services; security service; and other support costs.

The costs of purchased general conditions materials and services were recorded in THC's project accounting system at the expended cost amounts. Indirect labor was recorded in two general components: bare labor (consisting of the salary amount paid to personnel), and burden (composed of payroll taxes, insurance and benefits). In the quantification of the claimed acceleration damages on the Yazoo City project, the proposed project overhead rates are based upon the actual recorded costs incurred by THC on the project.

Many types of general conditions costs typically are driven by the size of the project and level of construction activity. For example, additional electric power, small tools and consumables were consumed to support the additional work. Given the nature of such costs, components of added general conditions resources and expenditures generally cannot be directly associated with discrete items of changed work. As commonly performed in the construction industry, THC has calculated a percentage rate for such activity-related general conditions costs, which is expressed as a percentage of direct labor costs. To determine this rate, THC quantified the activity-related general conditions costs incurred from project inception (March 2001) through March 2003, in the amount of $654,931. These activity-related costs represent 9.8% of the $6,671,751 total direct labor costs incurred by THC for this period. All claimed direct labor costs are thus marked up by 9.8% to recover added general conditions costs related

to the changed work.

**b. Overhead**

As with any construction contractor, THC incurs home office overhead expenses (also referred to as "G&A" expenses) in support of its overall business activities. G&A expenses include many kinds of items, such as the corporation president's salary; rent paid for home office space; accounting, human resources and legal personnel; and many others. Section E of the Construction Contract between THC and the FBOP addresses such costs, and provides that the contractor is entitled to a percentage mark-up on project costs incurred for changed work, as follows:

| Cost of Changed Work | Overhead % |
|---|---|
| First $20,000 | 10.0 |
| $20,001 to $50,000 | 7.5 |
| In excess of $50,000 | 5.0 |

Accordingly, all claimed costs for THC work are marked up with overhead using these contractually specified rates. The contract does not permit overhead markup on subcontractor costs, and thus no such markup is included on subcontractor amounts in this claim.

**c. Labor Burden and Fringes**

While not an indirect cost per se (i.e., labor burden and fringes can relate to direct project labor as well as indirect labor), THC has calculated a rate for payroll burden and fringes, based upon the actual recorded costs on the project. Payroll taxes, payroll insurance, and craft labor subsistence costs were incurred on the project at the rate of 44.7 cents per dollar of direct labor cost. Therefore, an additional 44.7 percent is added to all direct labor costs in the claim, to address the actual labor burden and fringe costs incurred to perform that

work.

d. **Profit**

THC's construction contract also addresses allowable profit on changed work. Similar to the overhead costs described above, the contract permits profit markup on THC work and commission on subcontractor work in varying amounts, dependent on the volume of changed work, as follows:

| Cost of Changed Work | Profit % |
|---|---|
| First $20,000 | 10.0 |
| $20,001 to $50,000 | 7.5 |
| In excess of $50,000 | 5.0 |

THC's claim includes profit at these contract-stipulated rates.

## B. Individual Claim Items

THC's acceleration/ loss of productivity damages are composed of several separate items, each relating to a specific activity or series of activities. Following is a description of the elements included in each item, and the methods used to quantify each claim amount.

1. **Summary of Claims**

In total, THC's acceleration/ loss of productivity claim is $1,656,828 (Exhibit 1- Table 1).

2. **Fine Grading ($14,725)**

THC self-performed the fine grading work under slabs on grade. THC was able to accomplish the majority (in excess of 80 percent) of its fine grading activities during periods unaffected by acceleration, and achieved a labor unit cost of $0.18 per square foot of area completed. However, the remaining 46,559 square feet of fine grading was performed during the accelerated period of September 2002 through February 2003, and reflected an impacted labor unit cost of $0.47. As set forth on Exhibit 2,

this deteriorated productivity as a result of the acceleration resulted in increased labor costs of $13,409, and total costs of $14,725 (including allocable activity-related general conditions costs).

3. **Concrete Formwork ($150,302)**

THC performed a substantial amount of its below-grade formwork (grade beams, edge forms, and slab-on-grade) during the accelerated period of September 2002 to November 2002.[1] THC suffered significant lost productivity as a result of that acceleration. In fact, THC suffered lost productivity on several other below-grade forming accounts as well, but since all of the work was performed in the accelerated period, there is no reasonable baseline to determine what that work would have cost in the absence of the acceleration. THC's form/strip/ reshore activities for elevated slabs were also heavily impacted by the acceleration.

As a result of performing concrete formwork activities in both unimpacted and extremely impacted conditions, THC suffered the following variations in formwork productivity.

| Formwork Activity | Unit of Measure | Productivity in Unimpacted Period ($/unit) | Productivity in Acceleration Period ($/unit) |
|---|---|---|---|
| Grade Beams | LF | 21.84 | 30.14 |
| Slab on Grade | LF | 6.40 | 10.24 |
| Edge Forms | SF | 3.27 | 33.74 |
| Elevated Slabs | SF | 8.62 | 9.96 |

As set forth on Exhibit 3, the deteriorated productivity in the impacted period caused THC to incur increased direct labor costs of $136,867, and total increased project costs of $150,302.

4. **Concrete Placement ($29,495)**

THC anticipated performing concrete placement and concrete clean-up activities over a twelve-month period. Given the volume of concrete to be placed, THC anticipated that one placement crew each for the housing and building areas,

[1] See footnote 3

moving efficiently from area to area throughout the numerous structures and levels, would perform the various pours. In such a manner, the placement crews would be kept highly utilized and productive throughout the planned duration of the concrete work.

However, in an effort to accelerate the project, the crews were required to work in whatever areas became available, causing the crews to jump from area to area on an ad-hoc basis, resulting in excessive downtime and non-productive work for the placement crews. The acceleration efforts resulted in substantially increased man-hours and costs to perform each cubic yard of concrete placement on the Yazoo City project during the period September 2002 through February 2003.

As set forth in the table below, the productivity of THC's concrete placement work was substantially lower in the accelerated period, resulting in much higher labor costs per unit.

| Concrete Placement Activity | Unit of Measure | Productivity in Unimpacted Period ($/unit) | Productivity in Accelerated Period ($/unit) |
|---|---|---|---|
| Grade Beams | CY | 2.53 | 13.98 |
| Foundation | % | 460.62 | 1,674.85 |
| Equip Pads | SF | 1.91 | 3.04 |

This lost productivity resulted in increased direct labor costs to THC of $26,858, which equals $29,495 including allocable general conditions costs (Exhibit 4).

## 5. Concrete Finishing ($121,974)

Upon completion of its pouring activities, THC dispatched its finishing crews to rub the concrete surfaces to contract requirements. The accelerated performance in the period September 2002 through February 2003 severely affected the productivity of these crews, increasing expended man-hours.

In the unimpacted periods, THC performed its concrete rubbing activities at a labor cost of $1.66 per square foot of surface area. However, in the accelerated period, THC performed 63,700 square feet at the rate of $3.40 per unit. This deteriorated

productivity in the impacted period resulted in increased direct labor costs of $111,070, and total increased project costs of $121,974 (Exhibit 5).

### 6. Added Maintenance of Temporary Roads ($352,080)

A very costly impact to THC was the need to repeatedly rework access roads throughout the project. THC performed some of the work to maintain the deteriorated roads, at an increased cost of $32,219 (Exhibit 6.a). However, due to the volume of work needed for this activity, THC subcontracted with W.S. Hancock to perform this work, for an additional increased cost of $319,861 (Exhibit 6.b).

### 7. Added Clean-up Activities ($302,285)

During unimpacted (i.e:, non-accelerated) periods, THC employed three clean-up crews, which performed normal project clean-up activities. However, as a result of project acceleration, additional clean-up crews were necessary, to handle increased levels of materials and waste related to increased tradesmen on the project, as well as to address the increased number of open work fronts. The increased costs incurred in the accelerated period were $302,285 (Exhibit 7).

### 8. Rework Subgrade ($262,966)

Erosion and light traffic over previously graded and satisfactorily completed areas greatly affected the subgrade areas in the period September 2002 through February 2003. THC subcontracted with W.S. Hancock to rework the subgrade and return it to the contours specified in the contract. THC incurred $262,966 for this added work (Exhibit 8).

### 9. Soil Stabilization Material Costs ($301,688)

THC performed soil stabilization activities in certain critical areas, to allow the work to proceed in a more expeditious manner. A subcontractor, W.S. Hancock, performed the majority of this work at a cost to THC of $206,014. In addition, THC provided the lime materials and a minimal amount of labor used in this effort, at a cost of $95,675, for a total cost of

$301,688 (Exhibit 9).

**10. Overhead, Profit, and Commission ($121,314)**

As set forth on Exhibit 10, THC has calculated a total of $39,084 overhead, $41,038 profit, and $41,192 commission on the costs of its changed work, according to the provisions of the contract.

## C. EARLY COMPLETION BONUS

THC substantially completed the project on August 15, 2003. Exhibit 11. The revised substantial completion date, through Modification No. 0021, was September 3, 2003. Thus, even without the additional 35 days that THC is entitled to, THC substantially completed the project 23 days early. The Contract provides that THC is entitled to an early completion bonus of $10,000 for each calendar day that THC achieves substantial completion before the contractual substantial completion date. Exhibit 13. Having met all the requirements for the payment of an early completion bonus, THC should have been paid an additional $230,000 for the 23 days that it substantially completed the project before the contractual substantial completion date. FBOP's failure to pay Haskell an early completion bonus was a clear abuse of discretion.

Additionally, given that THC was also due an additional extension of 35 days, THC's substantial completion date (August 15, 2003) was actually 58 days earlier than what the contractual substantial completion date should have been. Thus, THC should have been paid the maximum early completion bonus of $300,000. Exhibit 13.

THC requests, in this Claim, a contract extension of 35 days. The additional 35 days, combined with the 23 days that THC completed the Project early, results in a total early completion bonus of $300,000. Exhibit 13. THC requests an equitable adjustment in its contract of $300,000 to reflect this early completion bonus.

**D. SUMMARY OF DAMAGE CLAIM**

THC's total Claim submitted herein includes the acceleration/loss of productivity costs from the September 2002 – February 2003 time period and the Early Completion Bonus FBOP has yet to pay, along with interest on these sums. Thus, THC's total Claim is $1,956,828, plus interest. THC's reserves its right to submit an additional certified claim for other costs that THC may be entitled to pursue against FBOP on this Project.

THC stands willing to meet with FBOP in an effort to reach an amicable resolution of this Claim.

**VI. CERTIFICATION OF CLAIM**

The undersigned certifies that the Claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief, that the amount requested accurately reflects the contract adjustment for which Haskell believes the government is liable, and the undersigned is duly authorized to certify the claim on behalf of Haskell.

**THE HASKELL COMPANY**

By: [signature]
David K. Scheele
Vice-President and
Director of Construction